# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

DEBRA RENDE and PAULA
LOMBARD, as Co-Trustees of the June E.
Rende Revocable Trust U/D/T date June
10, 2015, as amended,

          Petitioners,

          v.

FRANK RENDE,

          Respondent.

)
)
)
)
)
)
)
)
)   C.A. No. 2021-0734-SEM
)
)
)
)

## MASTER'S FINAL POST-TRIAL REPORT

Final Report: February 23, 2023
Date Submitted for Final: December 12, 2022
Draft Report: October 5, 2022

David J. Ferry, Jr. and Thomas R. Riggs, FERRY JOSEPH, P.A., Wilmington, Delaware; *Counsel for Petitioners.*

Dean A. Campbell, LAW OFFICE OF DEAN A. CAMPBELL, P.A., Milton, Delaware; *Counsel for Respondent.*

**MOLINA, M.**

This case arises from the administration of the June E. Rende Revocable Trust U/D/T dated June 10, 2015 (the "Trust") and June E. Rende's estate (the "Estate"). June E. Rende (the "Decedent") died on September 6, 2021, leaving behind three adult children, who are the parties in this case: Frank Rende (the "Respondent"), Debra Rende, and Paula Lombard (together with Ms. Rende, the "Petitioners", together with the Respondent, the "Parties").[1] The Parties are serving as co-trustees of the Trust and were nominated as co-executors of the Estate, but are at an impasse. The Petitioners contend the Respondent breached his fiduciary duties to the Decedent and seek his removal as fiduciary and judgment to recoup alleged damages he caused to the Trust and the Estate. The Respondent contends it is the Petitioners who have breached their duties and should be required to provide accountings and return certain property to the Estate.[2] The Respondent also claims ownership of certain assets of the Trust and the Estate.

The Parties are no strangers to litigation. Several claims presented in this action have already been presented in, or are closely related to, prior actions in the Superior Court and the Family Court. It is unfortunate that the Parties' relationship

---

[1] Docket Item ("D.I.") 78, p.11.

[2] The rift between the Parties has grown so wide that all attempts for resolution have failed and future attempts seem highly unlikely. *See* Tr. 69:20-71:10 (referencing failed settlement efforts), Tr. 213:16-20 (referencing the pain felt by the Respondent and the rift between the Parties).

devolved to the level demonstrated in these proceedings. The Decedent, I am sure, expected and wished for better. But her wish to have all three of her children serve as co-fiduciaries is unworkable.

After a trial on the merits, I find: (1) the Respondent should be removed as co-trustee; (2) the Petitioners should be required to provide accountings, as further explained herein, but may continue to serve as co-trustees of the Trust; (3) the Respondent's share of the brokerage account should be released to him less the unpaid loans; and (4) the Estate should continue to be administered by the appointed neutral representative. This is my final report.[3]

## I.     BACKGROUND[4]

The twists and turns in the Parties' contentious relationship are, at times, difficult to follow. Actual and perceived slights between the Parties spurred litigation, changes to the Decedent's estate planning documents, and the Parties' use of, and claims to, the Decedent's real and personal property. Herein I attempt to unravel the mess the Parties created. I begin by looking to the Decedent's wishes as

---

[3] This final report makes the same substantive findings and recommendations as my draft report, to which exceptions were filed. The exceptions are addressed in footnotes where appropriate; as explained herein, I find they should be overruled and denied. This report also rules on the request for interim relief filed after my draft report was issued.

[4] The facts in this report reflect my findings based on the record developed at trial on May 3, 2022. *See* D.I. 88. I grant the evidence the weight and credibility I find it deserves. Citations to the trial transcripts are in the form "Tr. #." The Parties' jointly submitted exhibits are cited as "JX __."

2

reflected in her estate planning documents.[5] Then I address how those wishes were (or were not) carried out by the Parties.

## A. The Decedent's estate planning

It is unclear when the Decedent first engaged in estate planning. Sometime before 2014, per Ms. Lombard, the Decedent executed a power of attorney through which Ms. Lombard was appointed as the Decedent's agent.[6] Around that same time, per Ms. Lombard, the Decedent executed a will appointing Ms. Lombard as executrix.[7] But Ms. Lombard and the Decedent became estranged thereafter, beginning sometime in 2014.[8]

While Ms. Lombard was estranged, the Respondent and Ms. Rende took a more active role in the Decedent's life, leading to changes in the Decedent's estate planning in 2015. The Respondent explains that he and Ms. Rende attended a

---

[5] The Parties all testified as to their understanding of the Decedent's wishes. *See, e.g.*, Tr. 91:20-23. But I find her estate planning documents most informative for a few reasons. First, when it comes to her final wishes, Delaware law dictates that the Decedent's will is the end of my inquiry. *See Rambo v. Fischer*, 2022 WL 4180890, at *9 (Del. Ch. Sept. 13, 2022). Second, it appears each of the Parties had a period of estrangement from the Decedent. S*ee, e.g.*, Tr. 13:21-23 (Lombard). And third, each side, as one might expect, invokes the Decedent to support their cause. Although some invocations are more credible than others, I decline to make unnecessary credibility determinations based on secondhand accounts and, again, look to the documents the Decedent executed regarding and reflecting her final wishes. *Cf.* Tr. 165:15-166:18.

[6] Tr. 16:7-10. These earlier documents are not, however, in the record.

[7] *Id.*

[8] Tr. 13:21-14:4.

3

seminar regarding estate planning through trusts, which he thought was "good advice," so he "put [his] mother onto it and [they] created the [T]rust."[9] Ms. Rende contacted the law firm of Gordon, Fournaris & Mammarella, P.A. ("GF&M") and the firm prepared and the Decedent executed the original version of the Trust on June 10, 2015.[10] This original version is not in the record. But the Respondent testified that "it was a trust for [the Decedent], and [Ms. Rende] and [the Respondent] were the trustees."[11] Although Ms. Lombard was not named as co-trustee, the Trust, as it exited in 2015, did not exclude her as a contingent beneficiary.[12]

Then, in early 2019, Ms. Lombard came back into the Decedent's life. Ms. Lombard testified that, on March 14, 2019, the Decedent called "crying and say[ing] she misse[d]" Ms. Lombard.[13] This compelled Ms. Lombard to drive to the Decedent's home, where she reunited with the Decedent and found various estate planning documents (presumably the 2015 documents).[14] Ms. Lombard then took a

---

[9] Tr. 181:21-182:1.

[10] JX III, Ex. 1. The Decedent also executed a will and power of attorney. *Id.*

[11] Tr. 182:22-23.

[12] JX III, Ex. 1. *But see* Tr. 182:24-183:1 (the Respondent) (testifying that he believed Ms. Lombard was not mentioned in the 2015 version of the Trust).

[13] Tr. 15:12-17.

[14] Tr. 15:18-23. *But see* Tr. 183:13-18 (the Respondent) (testifying "the house was rifled through, the drawers were all rifled through").

4

more active role in the Decedent's life; she became the Decedent's power of attorney and helped the Decedent move.[15] Ms. Lombard contacted GF&M and, with the firm's assistance and the Decedent's involvement, the Trust was amended on May 23, 2019.[16]

Ms. Lombard's involvement spurred numerous disputes. In August 2019, Ms. Lombard helped her mother move and ended up with "a carload full of

---

Presumably, it was around this time when Ms. Lombard found the Decedent's handwritten note regarding loans the Decedent made to the Respondent in the total amount of $14,627.10. Tr. 89:14-20. *See also* JX FFF. The Petitioners doubt the document reflects all of the loans the Decedent made to the Respondent and neither believes the Decedent would have forgiven the loans. *See* Tr. 89:14-22; 162:21-23. Ms. Rende was more unequivocal, testifying that the loans "were not paid back." Tr. 172:16-19. The Respondent does not deny that these loans were made to him and testified that he knew all about the handwritten note, which the Decedent presented to him. Tr. 271:9-18. But he represents that the Decedent told him not to worry about repaying the loan because it was his money anyway. Tr. 271:9-24. The Respondent never had the Decedent reduce this purported forgiveness to writing. Tr. 272:1-10.

[15] *See* Tr. 112:16-22; JX Z. *But see* JX III, Ex. 1 (reflecting the intent to appoint Ms. Lombard and the Decedent's grandson, Nicolas Rende, as co-agents).

[16] Ms. Lombard admitted that she was upset with the original version of the Trust because she felt excluded. Tr. 16:4-10. *See* JX III, Ex. 1. Michael M. Gordon, Esquire from GF&M explained at his deposition that he personally spoke with the Decedent and Ms. Lombard on April 30, 2019 and drafted new estate planning documents to ensure equal treatment of the children, which was one of the Decedent's goals. JX III, p.9-13. During that conversation, the Decedent expressed an interest in further protecting the Respondent's share of her estate through a trust. JX III, p.13-14, Ex. 1. Per Mr. Gordon "there were some concerns with spending and perhaps creditor issues for [the Respondent] and [the Decedent] just really wanted to make sure his one-third would be protected and be available to him for the remainder of his lifetime." JX III, p.14. GF&M prepared new documents that the Decedent executed. JX III, p.17. Those documents included a will, trust, and power of attorney. *Id.*; JX III, Ex. 1.

merchandise."[17]  On August 21, 2019, the Decedent filed an affidavit for an emergency *ex parte* order with the Family Court alleging that Ms. Lombard "came to Delaware and took all valuable items from" the Decedent's real property.[18]  The Decedent further alleged abuse, propensity for violence, and made other concerning allegations about Ms. Lombard.[19]  But the Decedent and Ms. Lombard settled the action on September 5, 2019 and it was voluntarily dismissed.[20]

---

[17] Tr. 86:7-18.

[18] JX X, p.3-12. The Respondent admitted it was his handwriting on the filing and that the Decedent and Ms. Rende "just let [him] do it, like [he'd] done everything as long as [he] can remember." Tr. 186:19-20.  Shortly before the Family Court action, the Decedent signed a handwritten document revoking the power of attorney through which Ms. Lombard was appointed.  *See* Tr. 112:16-22; JX Z.

[19] JX X, p.9.

[20] JX X; JX Y.  Through the settlement, Ms. Lombard was required to "advise where all tangible personal property and household furnishing removed from the [Decedent's real property] are now located, to the best of her knowledge," return "any tangible personal property or household furnishings from the [Decedent's New Jersey property]" which Ms. Lombard removed, and return a vehicle and "[a]ny of the Petitioner's assets under the possession or control of" Ms. Lombard to the New Jersey property. JX Y.  The Respondent testified that Ms. Lombard did not return any items, except certain stock. Tr. 188:11-16. But the Respondent also admitted that he "didn't see [Ms. Lombard] take [the Decedent's] stuff. [He] wasn't there." Tr. 189:6-7.  Ms. Lombard appears to admit that she did not return the items; rather, she told the Respondent to "[c]ome up and get the stuff," but he failed to do so from September 2019 through November 2020, when the New Jersey property was sold. Tr. 87:2-6. Ms. Lombard testified that she did not remove any property from the New Jersey property that she was required to return. Tr. 140:17-24.

Certain jewelry and a tea set are at issue in this proceeding. Ms. Lombard testified that the Decedent gave her "costume jewelry" and "a tea set from [Ms. Lombard's] grandparents" on March 14, 2019. Tr. 85:24-86:6. *But see* Tr. 187:14-19 (the Respondent) (testifying: "I know it was very valuable. My grandmother Roberts, who was most of the jewelry in there . . . had top quality things. Like, not little diamonds, big expensive diamonds"); Tr. 187:23-24 (the Respondent) (explaining that the family "heard for 30 years how [the tea set] was $75,000 in 1990"). *See also* Tr. 206:2-7 (the Respondent) ("There's

Thereafter, the Parties seemed to come together. On September 6, 2019, Mr. Gordon spoke to the Parties, without the Decedent. He "thought it was a productive phone conference," and that the Parties had decided to put their differences aside.[21] Thus, GF&M prepared new estate planning documents, which would require the Parties to work together jointly to assist and support the Decedent.[22]

The Parties and Mr. Gordon met in person on October 1, 2019 for the Decedent to sign the new estate planning documents, which included the Trust, a durable power of attorney (the "POA") and a last will and testament (the "Will") (together, the "Final Plan").[23] Through the Final Plan, the Decedent relinquished control over the Trust in favor of her children (the Parties) serving as co-trustees for her benefit, and set forth a plan for her children (the Parties) to also administer the Estate, jointly; ultimately, she wished for them to also share jointly in the Estate.[24]

---

a safe that [Ms. Lombard] hauled out in March full of cash and all [their] grandmother's expensive things that are gone."). Ms. Rende testified that the Decedent gave the tea set and jewelry to Ms. Lombard in May of 2019, before the move in August 2019. Tr. 159:18-160:9. When confronted that her contemporaneous notes seemed to suggest otherwise, Ms. Rende testified that she had "that wrong. The tea set was already gone." Tr. 174:18-19; JX NN.

[21] JX III, p.18.

[22] *Id.* at p.21-23.

[23] *See* Tr. 21:16-21. Per Mr. Gordon, the Decedent understood the documents and "was also very happy about . . . her three children being able to work together." JX III, p.23.

[24] Mr. Gordon explained that "[s]ince his representation of [the Decedent] commenced, it was pretty clear to [him] that she wanted all three children to be treated equally." JX III, p.24.

Specifically, the final version of the Trust provided that the Decedent would be the sole beneficiary of the Trust during her life and upon her death the Trust's assets would pass equally to the Parties.[25] The Decedent named the Parties as co-trustees "acting together and not separately."[26] She expressed her "intent that while [her] children are serving as Trustees of [the] Trust, any action to be taken by the Trustees must be with the unanimous consent of [the] children."[27] The POA contained the same limitation that the Parties act "together, and not separately[;]" the Parties were only authorized to act "with the agreement of all other joint agents."[28] And, finally, through the Will, the Decedent bequeathed tangible personal property to the Parties equally and the residue to the Trust.[29] She appointed the Parties as co-representatives to serve and administer the Estate "jointly."[30] These documents remained in place until the Decedent's death on September 6, 2021.

---

[25] JX T, p.2.

[26] *Id.* at p.16-17.

[27] *Id.* at p.16-17. Ms. Lombard testified that she felt the unanimous requirement protected the Decedent. Tr. 19:17-24. Ms. Rende, however, "had doubts about it" because she wondered "[h]ow can three be unanimous?" Tr. 154:5-15. She was not sure it would "[w]ork smoothly." Tr. 154:18-20. Mr. Gordon agreed; the requirement of unanimous consent from three co-fiduciaries was unusual and he had "some concern that . . . it could potentially cause some problems." JX III, p.19-20.

[28] D.I. 5, Ex. C.

[29] JX U, p.1.

[30] *Id.* at p.5.

## B. After the Final Plan

When the Parties began serving as co-trustees under the Trust and co-agents under the POA on October 1, 2019, the Decedent had substantial assets. The Decedent had interests in two pieces of real property, 641 Adams Drive in Milton, Delaware (the "Milton Property"), and 486 Stonetown Road in Ringwood, New Jersey (the "Ringwood Property").[31] The former was an asset of the Trust, the latter was in the Decedent's name.[32] The Decedent also had a brokerage account and two IRAs.[33] The brokerage account was an asset of the Trust; the IRAs were in the Decedent's name.[34] The Decedent also personally owned a 2006 Acura (the "Vehicle") and other tangible personal property.[35]

The Parties dispute the use, treatment, or disposition of the Ringwood Property, brokerage account, IRAs, and the Vehicle during the Decedent's life. I address these categories in turn. Issues with the Milton Property, it appears, did not arise until after the Decedent passed; they are addressed below.

---

[31] *See* Tr. 26:22-24.

[32] *See id.*

[33] *See* Tr. 26:24-27:4.

[34] Tr. 27:1-4.

[35] Tr. 27:5-7.

### 1.    The Ringwood Property

The Ringwood Property was sold in November of 2020 for $350,000.00.[36] The purchase was financed in part with the buyer providing a $200,000.00 down payment and the Decedent lending the buyer the remaining $150,000.00 through a mortgage earning interest at five (5) percent per annum.[37] Ms. Lombard testified that the funds from the down payment went into a WSFS checking account (the "WSFS Account").[38] The WSFS Account was in the Decedent's name and listed Ms. Rende as the sole beneficiary.[39] At the time of the Decedent's death, less than one (1) year after the sale, the WSFS Account had a balance of $36,865.00.[40]

---

[36] Tr. 27:12-24. It appears it was sold on the Decedent's behalf by the Parties as her agents under the POA. Tr. 27:12-29:15.

[37] Tr. 27:16-24. *See also* JX B; JX D.

[38] Tr. 142:22-143:4.

[39] JX I; JX Q, p.2. It is unclear who had access to the WSFS Account and there are no statements from the WSFS Account in the record.

[40] JX DD; D.I. 91, p.28. At trial, counsel to the Respondent identified a discrepancy regarding the balance of the WSFS Account. Tr. 9:13-18. Although this issue was not addressed directly at trial, the Petitioners represented in their post-trial brief that the WSFS Account "was worth $8,235.79 at the time of [the Decedent's] death." D.I. 92, p.20. Nevertheless, I continue to use the date of death value from the evidence introduced at trial.

The mortgage was paid off after the Decedent died, by the end of December 2021. Tr. 28:1-3. Ms. Lombard accepted payments made towards the mortgage after the Decedent's death (from October through December 2021) and provided those funds to Leslie DiPietro, Esq., the administrator of the Estate, minus reimbursements to Ms. Lombard for taxes and other out-of-pocket expenses she paid on behalf of the Estate. Tr. 28:14-17; D.I. 78, p.12. There appears to be no dispute about the sufficiency of Ms. Lombard's payment or the claimed credits.

## 2.    The brokerage accounts

When the Parties began serving as co-trustees and co-agents, the Decedent held investments in an account with TD Ameritrade (the "Ameritrade Account").[41] In October 2019, the Ameritrade Account was valued at $3,993,693.23 and titled in the name of the Trust.[42] But in late October or early November 2019, the Respondent transferred the securities in the Ameritrade Account to an account with Interactive Brokers, LLC (the "IBKR Account").[43] Ms. Lombard knew of the transfer to the IBKR Account beforehand and testified that the Respondent wished to move the funds because "he didn't like the way he was treated at TD Ameritrade."[44] Per the Respondent, the Decedent wanted the securities transferred and participated actively in the process.[45]

Motivations aside, the Parties were all informed before the transfer. Unbeknownst to the Petitioners, however, the Respondent opened the IBKR

---

[41] Tr. 33:23-34:5. *See* JX Q (reflecting Ms. Rende as the beneficiary).

[42] JX GGG, p.1.

[43] *Id.*; JX HHH. *See also* Tr. 94:10-13 (affirming that Ms. Lombard has "not sued [the Respondent] for anything that's missing that [she] claim[s] he's taken"). It appears that around $60,000.00 was left in the Ameritrade Account, but there is no dispute about those funds. *See* Tr. 93:18-94:13.

[44] The Respondent went a step further in his testimony, representing that the Petitioners had access to the IBKR Account right after it was opened. Tr. 270:14-22. But Ms. Lombard testified that, despite knowing it would be opened and that she should have been involved, she did not have access until January 2020.  Tr. 42:21-43:13.

[45] Tr. 193:4-18.

Account in the Decedent's name, not the Trust's.[46]  And once the securities were in the IBKR Account, the Respondent began an aggressive investing strategy, which he did not disclose to, nor seek agreement on from, the Petitioners.[47]  He decided to trade on margin, "borrow[ing] money from the broker to buy stock" through numerous transactions.[48]  The Respondent testified that he "monitored [the IBKR Account] every single day, every single second when the stock market was open."[49]  In addition to monitoring the IBKR Account, the Respondent researched the stock market and developed strategies on what to buy and sell.[50]  At the end of November 2019, the IBKR Account had a balance of $3,823,674.09.[51]

---

[46] Tr. 35:1-36:17, 268:23-269:3. The Respondent testified that he and the Decedent transferred the account together. Tr. 268:6-10.

[47] The Respondent admitted that he did not tell the Petitioners that he would be margining the account. Tr. 270:2-4 ("I didn't tell them anything. Why would I tell them? They don't even talk to me. They can't stand me."). Although the Respondent clearly has an interest in investing and trading, he testified that he has no formal training regarding investing but has traded actively for 30 years. Tr. 274:1-5. *See also* Tr. 192:3-8 (the Respondent) (explaining that the Decedent "became less and . . . less enthusiastic about her account" which "hurt [him] inside").

[48] Tr. 195:3-6.  Per Black's Law Dictionary, a margin account is "[a] brokerage account that allows an investor to buy or sell securities on credit, with the securities usually serving as collateral for the broker's loan." *Margin Account*, Black's Law Dictionary (11th ed.).

The Respondent contends margin trading "wasn't risky" but admits that he needed to "watch the account every second of the day." Tr. 255:1, 256:20-22. *See also* JX S. The Respondent further admitted that he "knew" a certain transaction "was dangerous". JX S, p.1.

[49] Tr. 194:7-10.

[50] Tr. 197:2-8.

[51] JX HHH, p.1.

Ms. Rende was the first to discover that the Respondent had margined the Trust's assets, sometime in the middle of December 2019.[52] Ms. Rende testified that the Respondent offered her five (5) percent of what he made to "keep [her] mouth shut" and not tell Ms. Lombard or the Decedent about his activities.[53] Ms. Rende declined and, instead, shared her discovery with Ms. Lombard and the Decedent; per the Petitioners, the Decedent was upset by the news.[54] Ms. Lombard also contacted an attorney (presumably Mr. Gordon) to understand how the Respondent was investing without input from the Petitioners.[55] The Respondent continues to believe, however, the Petitioners did not need to be included in his investment plan and the Decedent was on board.[56]

---

[52] Tr. 157:16-24. Ms. Rende testified that she found out about the Respondent's margining "a day or two after December 20th of 2019." Tr. 157:23-24. Her recollection appears off. *Cf.* Tr. 96:2-5.

[53] Tr. 158:24-159:8.

[54] Tr. 37:13-15, 158:18-23. The Respondent disagrees and testified that the Decedent knew he was margining "the whole time, and she was excited and happy, and she was participating in her account, and she was enjoying it." Tr. 279:12-17.

[55] Tr. 37:15-17. Mr. Gordon testified, in his opinion, that if the IBKR Account was a trust account, it would not have been appropriate for the Respondent to act "unilaterally" to trade in the account, "[i]t would have required the participation of the other two siblings or [the Decedent] would have had to take that action on her own." JX III, p.28.

[56] *See* Tr. 198:22-24, 279: 12-17. The Respondent was adamant that his investment plan was set up to provide each of the Parties "1600 shares each free of Home Depot." Tr. 208:22-209:1. When asked whether margin trading was a prudent thing to do for the Decedent, the Respondent admitted his investing "wasn't for [the Decedent]. It was for [the Parties]." Tr. 257:21-22. He testified that he was "absolutely" investing for himself and his sister, until opposing counsel asked: "Do you know as a fiduciary you're not supposed to do that? You're supposed to be doing things for the benefit of the person to whom you're

13

On December 18, 2019, the Parties spoke with Mr. Gordon on the phone to discuss the future of the IBKR Account.[57] The Respondent described the meeting as a surprise attack "from all angles."[58] But he agreed that the meeting ended in a resolution: securities in the IBKR Account would not be traded but rather would be held for a year and a day.[59] The Parties and Mr. Gordon also discussed, after that holding period, cashing out the IBKR Account and dividing it into LLCs held by the Parties.[60] That plan was not fully consummated.[61]

But, thereafter, the Respondent could no longer margin the IBKR Account because he no longer had access thereto.[62] This concerned him, because the Petitioners were unfamiliar with margining and the IBKR platform.[63] The Respondent testified that he "asked 50 times what's happening," but the Petitioners

---

a fiduciary?" Tr. 257:23-258:7. Then he changed his tune: "I did do it for the benefit of [the Decedent]." Tr. 258:8. His about-face was not credible.

[57] Tr. 198:11-200:8. *See also* JX III, Ex. 3 (regarding a June 30, 2020 follow up meeting).

[58] Tr. 198:18.

[59] Tr. 198:24-199:2.

[60] JX III, p.32; JX S, p.3-4; Tr. 200:2-8.

[61] Per Ms. Rende, the Respondent would not sign the documents to confirm the agreement. Tr. 155:9-15. The Respondent confirmed as much, testifying that he did not agree to the proposed distribution. Tr. 243:11-19. Per Mr. Gordon, "it was not completed because there was not agreement amongst the three children as to how to allocate funds to the respective LLCs." JX III, p.35.

[62] Tr. 199:3-8. The Respondent testified that he was "[l]ocked out of everything as far as knowledge of anything that's going on." Tr. 199:11-12.

[63] Tr. 199:16-23, 43:24-44:4.

would not tell him.[64]  This testimony conflicts with the numerous records introduced at trial showing the Respondent's continued involvement.[65]  Still, the IBKR Account had a balance of $4,339,731.73 at the end of December 2019, an increase of $516,057.64 from the November 2019 ending balance.[66]

Despite their disputes over the Respondent's handling of the IBKR Account, the Parties were able to come together as co-trustees to purchase real property at 9202 Shore Drive in Milton, Delaware (the "Shore Drive Property") in February 2020.  The Parties purchased the Shore Drive Property for $405,000.00 on behalf of

---

[64] Tr. 199:6-8.

[65] *See* JX HH.  This involvement was largely in connection with margin calls. Securities purchased on margin are subject to margin calls from the brokerage, which are a "securities broker's demand that a customer put up money or stock as collateral when the broker has financed the purchase of securities. A margin call usually occurs when the market prices of the securities are falling." *Margin Call*, Black's Law Dictionary (11th ed.).

On the night of December 18, 2019, a margin call occurred on the IBKR Account. Tr. 120:18-21.  The margin call was for $159,700.00 and resulted in that amount of stock being sold from the IBKR Account.  JX BB.  Ms. Lombard did not know how to deal with the margin call and reached out to the Respondent in an email on December 26, 2019. JX GG. The Respondent replied via email the next day, providing instructions on how to deal with the situation. JX HH.  But Ms. Lombard testified that she still did not know how to use the IBKR platform and did not trust the Respondent's advice on how to resolve the situation. Tr. 121:10-15.  It is unclear what, if anything, the Petitioners did regarding the margin call. A second margin call occurred several months later, in March, 2020. JX H. This second margin call resulted in 19 transactions from the IBKR Account, totaling a sale of $824,744.82. *Id.*

[66] JX HHH. The Respondent believes the increase should have been even greater. Tr. 204:20-23.

15

the Trust, using funds from the IBKR Account.[67]  There is no dispute that the Shore

Drive Property was titled in the name of the Trust but that it was purchased largely

for the Respondent's use and enjoyment.[68]

But the waters did not stay calm for long.  On December 9, 2020, the

Respondent filed a civil action in the Superior Court against the Decedent (the

---

[67] Tr. 32:1-8; JX DDD. Ms. Rende accessed and withdrew the funds from the IBKR Account. Tr. 32:1-8. *See also* JX A.  Currently, the Shore Drive Property has an approximate market value of $475,000.00. D.I. 78, p.13.

[68] Tr. 83:2-6, 155:20-24, 245:23-246:5. The extent of the Respondent's interest in the Shore Drive Property is in dispute.  Ms. Lombard testified that she agreed to the purchase "as long as [the Respondent] pays his expenses and that [the Shore Drive Property] goes in the [T]rust." Tr. 31:21-24.  In her words, the Shore Drive Property was for the Respondent's "use, and he was to pay the expenses. But it was owned by the [T]rust." Tr. 32:9-12.  She disagreed that it was "understood that [the Respondent] was to inherent [*sic*] the house." Tr. 134:20-23.  Ms. Lombard testified, rather, that the Respondent would have to buy the Petitioners out if he wanted the Shore Drive Property. Tr. 136:2-5. Ms. Rende testified that the Parties would have to unanimously agree to sign over the Short Drive Property to the Respondent. Tr. 156:6-11.

The Respondent's claimed interest in the Shore Drive Property changed numerous times.  Initially, in his discovery responses he averred: "Decedent sold the Shore Drive property to me. The contract was provided in Respondent's Production of Documents." JX JJJ. But no such contract was introduced and at trial he renounced any such claims. Tr. 249:8-16. And even at trial he could not keep his position straight. At various times the Respondent testified that he "bought that house," the Shore Drive Property was given to him by the Decedent, and that "[e]veryone knows it was given - - that it was [his] house that [he] bought," or that the house was bought "with the money [he] earned." Tr. 251:7-8. Nonetheless, the Respondent admits that the Shore Drive Property is in the Trust's name, and he has no documentation to prove he was meant to be the sole owner. Tr. 245:11-246:13. Yet he contends "that house was going to go to [him] anyway." Tr. 245:17-18. *See also* Tr. 251:17-18 ("It's in the trust because it's going to go to me upon my mother's death."). *But see* JX KK (explaining "I did not get a house . . . It's in Mom's trust. . . not my name.").

Ms. Lombard also testified that the Respondent did not pay any taxes or insurance for the Shore Drive Property as the Parties agreed he would. Tr. 67:19-68:5.

16

"Superior Court Action").[69]  Through the Superior Court Action, the Respondent claimed that he and the Decedent had an agreement that the Respondent could margin trade on the IBKR Account and retain the benefits therefrom.[70]  The Superior Court Action was dismissed with prejudice on May 21, 2021.[71]

---

[69] JX V.  In his complaint, the Respondent averred that on or about November 26, 2019, he and the Decedent entered into an agreement that the Respondent could "access, and profit exclusively from any 'profit' made using available 'margin' in [the Decedent's] brokerage [account]." *Id.* He claimed the Decedent was enriched by 2.2 million dollars. *Id.*  Sometime in 2020, the Respondent also tried to get guardianship of the Decedent. *See* Tr. 239:18-240:24. He was unsuccessful, however, because he could not obtain the required physician's affidavit. *See* Tr. 240:1-5; Ct. Ch. R. 175(c)(4).

From 2019 through 2021, the Respondent also filed petitions for protection from abuse against the Petitioners on his own behalf and on behalf of the Decedent. *See* JX X. All such actions were dismissed with prejudice. *Id.*

[70] Tr. 232:20-234:13. The Respondent did not attach any written agreement to his pleadings in the Superior Court Action but produced one in this action. *Compare Rende v. Rende*, S20C-12-013 MHC, D.I. 1 *with* JX EEE. The agreement is dated October 26, 2019, written by the Respondent and signed by the Respondent and the Decedent and provides:

> I June Rende, hereby offer avail "margin" in Ind/Trust/IRA's, to be used by Frank Rende. Frank Rende is responsible for all costs/profits. If loss occurs Account will be + or - adjusted after 12/3/2020. If profit, it is to be Frank Rende's discretion how to access said gains + invest. This agreement is between June Rende + Frank Rende ONLY. Said profits will go in New Trust btwn June Rende (mother) + Frank Rende (son).

JX EEE.  Ms. Lombard testified that she had no knowledge of this agreement. Tr. 46:3-47:11. Ms. Rende testified that the Decedent was "so upset" when she learned that the Respondent had margined the securities in the IBKR Account. Tr. 158:18-21. *But see* JX S, p.9 ("I had mom sign an agreement giving me permission to Use her margin to get on my feet."); *id.* at p.25 ("Why do you think I had mom sign a contract? She changes her mind every week or Two.").

[71] JX W. The Respondent testified that the dismissal was not on its merits but rather because he did not appear. Tr. 281:3-7. But, at the request of the Parties, I have taken judicial notice of the Superior Court Action, particularly D.I. 23 and 29. *See* Tr. 291:5-9 (explaining that I would "read the motion for judgment on the pleadings, any written response – although there doesn't appear to be one – but then the transcript from that argument hearing"). *See*

The Respondent testified, confusingly, that the Decedent directed, approved of, or otherwise agreed with the Respondent's goals in the Superior Court Action.[72] Although the goals evidenced on the docket of the Superior Court Action were monetary relief (he sought over $2 million), he testified that what he really wanted was access to the IBKR Account.[73] I find this representation unbelievable.[74]

*also* D.R.E. 202(d)(1)(C). That record confirms that the Decedent, through counsel, moved for judgment on the pleadings on April 16, 2021, arguing the Respondent failed to plead an enforceable contract because the alleged agreement lacked consideration (the alleged agreement was completely one-sided with no benefit to the Decedent). D.I. 23. The Respondent never responded but appeared at the noticed hearing, where he argued adamantly that he never received the motion and would not willingly ignore a request to dismiss the Superior Court Action because it was important to him. *Rende v. Rende*, S20C-12-013 MHC, D.I. 29 at 2:10-19. At the hearing, the Respondent testified much like he did at trial—that everyone knew he was always expected to get paid for his investing efforts. *Compare Rende v. Rende*, S20C-12-013 MHC, D.I. 29 at 14:3-10. *with* Tr. 262:13-18. Ultimately, Judge Conner ruled from the bench, granting the motion because the agreement lacked consideration. *Rende v. Rende*, S20C-12-013 MHC, D.I. 29 at 18:1-4. Judge Conner confirmed the dismissal was "with prejudice." *Rende v. Rende*, S20C-12-013 MHC, D.I. 29 at 18:19-21.

[72] *See* Tr. 260:5-261:14. *But see* Tr. 124:1-2 (Ms. Lombard) ("After my brother sued my mother in December of 2020, she was very, very upset.").

[73] Tr. 234:2-5.

[74] *See, e.g.*, *Rende v. Rende*, S20C-12-013 MHC, D.I. 29 at 19:9 ("I'm owed this money. I'm going to try to vacate this judgment, because I have been stabbed."). *See also* Tr. 262:13-22 ("Q. . . . [A]re you claiming you're entitled to something for the trading that you did under that contract? A. I think I am, because I was promised to be paid. Q. Under that contract that we talked about; right? A. Not just the contract, I was promised verbally to be paid.").

Nevertheless, this action has provided some access, reflected in the following chart:[75]

| IBKR Account | | | |
|---|---|---|---|
| **Date** | **Controlling Parties** | **Net Asset Value** | **Increase/Decrease** |
| November 30, 2019[76] | The Respondent | $3,823,674.09 (Starting Balance) | N/A |
| December 31, 2019[77] | The Respondent until December 19, 2019, then the Petitioners | $4,339,731.73 | +$516,057.64 |
| October 1, 2020[78] | The Petitioners[79] | $3,681,385.69 | -$658,346.04[80] |
| November 6, 2020[81] | The Petitioners[82] | $14,068.94 | -$3,667,316.75 |
| December 25, 2020[83] | The Petitioners[84] | $0.00 | -$14,068.94 |

[75] The Respondent argues that information from December 18, 2019 to December 31, 2019 is missing. *See* Tr. 196:1-11. The Respondent testified that the IBKR Account balance was approximately $500,000.00 lower on December 31, 2019 than when he relinquished control on December 19, 2019. Tr. 204:18-23.

[76] JX HHH.

[77] JX H.

[78] *Id.*

[79] *But see* Tr. 128:13-129:10.

[80] Records for the IBKR Account also reflect disbursements totaling $655,000.00. JX H (showing $405,000.00 disbursed on February 13, 2020, $50,000.00 on July 15, 2020, and $200,000.00 on July 15, 2020).

[81] JX AAA.

[82] *But see* Tr. 128:13-129:10, 43:24-44:4.

[83] JX UU.

[84] *But see* Tr. 128:13-129:10, 43:24-44:4.

As this chart shows, the value of the IBKR Account increased during the Respondent's stewardship and decreased after his removal. But the increase was not without additional fees. The Trust owed commissions of $7,609.43 for trades made in November 2019, $7,498.81 for trades made in December 2019, and $170.46 for trades made in 2020.[85] The Trust also owed margin interest of $1,264.09 for November 2019, $5,597 in December 2019, and $39,929.97 in 2020.[86] The Decedent also incurred a federal income tax obligation of $234,125.00 in 2019 and a Delaware state tax obligation of $52,183.00 in 2019 as a result of the investing.[87] The commissions, interest, and tax obligations were less during the Petitioners' stewardship.[88]

In October or November 2020, Ms. Lombard decided to transfer the Trust securities from the IBKR Account to a new account with Fidelity (the "Fidelity Account").[89] The Fidelity Account shows securities transferred in and a net portfolio balance of $4,003,127.03 by November 30, 2020.[90] The securities remained in the

---

[85] JX HHH; JX UU.

[86] JX HHH; JX U.

[87] JX R.

[88] *Compare* JX BBB and JX CCC *with* JX R.

[89] Tr. 33:18-20.

[90] JX E.

20

Fidelity Account until the Decedent passed.[91]  The date of death value was $4,267,659.95.[92]

### 3. The IRAs

The Decedent also had an IRA and a Roth IRA with Fidelity (the "Fidelity IRAs").[93]  Ms. Lombard admitted that she opened the Fidelity IRAs on the Decedent's behalf and that the Decedent initially wanted the Fidelity IRAs to inure to the benefit of the Parties equally.[94]  But, per Ms. Lombard, after the Respondent filed the Superior Court Action the Decedent "changed the IRAs."[95]  Later in her testimony, however, Ms. Lombard admitted that she was the one who changed the beneficiary designations "[u]nder [the Decedent's] instruction," for which she does

---

[91] Tr. 33:21-22.  Since the Decedent passed, the Petitioners have both received their 1/3 share of the securities in the Fidelity Account, but the Respondent has received nothing. Tr. 128:6-9; D.I. 78, p.13. Fidelity has withheld these funds pending a ruling on any damages caused by the Respondent. *Id.*

[92] JX DD.

[93] D.I. 78, p.13.  The Decedent also had an IRA conversion account with TD Ameritrade, which named the Respondent and Ms. Rende as 50/50 beneficiaries. *Id.*

[94] Tr. 125:11-3; Tr. 91:20-23, 92:12-21. *See also* JX III, p.26 (Gordon) ("She did have a retirement account and the recommendation was to have that payable to the three children equally for income tax planning purposes.").

[95] Tr. 92:18-19.

not have any documentation.[96]  Since the Decedent's passing, the Petitioners have both received full distributions from the Fidelity IRAs.[97]

### 4.    The Vehicle

The Parties also dispute ownership of the Vehicle.  In a January 7, 2020 email, the Respondent averred he had been promised the Vehicle "[s]ince 2013."[98]  But he acknowledged the Decedent had not sold or otherwise transferred title to him at that time.[99]  He added: "I could have gotten it changed over, just by asking [the Decedent] at [the] right time…im [*sic*] not that type [of] person!"[100]  But he was that type of person, after all.  The Respondent introduced a handwritten document dated January

---

[96] Tr. 125:14-126:3. Ms. Rende attempted to back up Ms. Lombard's testimony but was unconvincing. Initially, Ms. Rende testified that the Decedent wanted to remove the Respondent from everything after he filed the Superior Court Action. Tr. 165:20-166:7. But when asked specifically if the Decedent wanted the Respondent to be removed from the Fidelity IRAs, she backed off explaining: "I don't know too much about that – they might have just been overlooked when they were in TD because I never knew about them." Tr. 166:11-15. She then attempted to revert: "So [the Decedent] wanted to change them, I'm sure, if, you know, she was aware of them." Tr. 166:17-18.  Mr. Gordon testified that distribution of the Fidelity IRAs to only two beneficiaries "would not appear to be consistent with [the Decedent's] wishes." JX III, p.45. But he acknowledged that the Decedent could have decided to make such a change and accomplish same without GF&M's assistance. JX III, p.47-48.

[97] Tr. 128:2-5.

[98] JX PP.

[99] *Id.*

[100] *Id.*

22

26, 2020, which was signed by the Decedent and provided: "I June Rende sell 2006 Acura TL for $1 to Frank Rende Jr."[101]

In or around March of 2020, the police arrested the Respondent and returned possession of the Vehicle to the Decedent.[102]  The Respondent, in turn, filed protection from abuse petitions against the Petitioners in Family Court seeking return of the Vehicle or $12,000.00 for its loss.[103]  Commissioner Southmayd dismissed the Respondent's petitions on their merits and warned "[t]he PFA statute is not a shortcut for all legal claims one may have against family members. [The Respondent] is warned that subsequent frivolous petitions may result in sanctions."[104]  Despite his representations before the Family Court regarding the value of the Vehicle, the Respondent was cagey during trial, testifying that he "assume[s]" it was worth more than $1.00 but he has "no idea."[105]

---

[101] JX XX. Tr. 212:14-213:3, 85:12-15.

[102] *Cf.* JX X (reflecting the date of the Respondent's arrest as April 7, 2022).

[103] *Id.*

[104] *Id.*

[105] Tr. 253:6-9. It appears Ms. Rende is now in possession of the Vehicle. Tr. 214:5-12.

## C.    After the Decedent's death[106]

Issues with the Milton Property arose after the Decedent's death on September 6, 2021. By way of background, the Decedent moved to Delaware in 2011 or 2012 and purchased the Milton Property jointly with her boyfriend Jacob Roll.[107] Mr. Roll passed in 2014.[108] Under the terms of Mr. Roll's will, the Decedent had an option to purchase Mr. Roll's share of the Milton Property for $100,000.00.[109] The Petitioners attempted to exercise that option after the Decedent's death but they did not obtain the Respondent's agreement.[110] As such, Mr. Roll's estate would not complete the sale.[111] The Petitioners have set aside $100,000.00 in escrow, so that the transaction can be completed, pending approval by all three co-trustees or an order removing the Respondent as co-trustee.[112]

---

[106] The Respondent testified that "the date after [the Decedent] died," Ms. Rende "stole $2,000.00" from the Respondent. Tr. 212:11-13. But he has not pled any claim for relief related thereto.

[107] Tr. 22:12-19. Ms. Rende moved into the Milton Property before the Decedent and Mr. Roll passed to assist them with their needs. *See* Tr. 150:23-151:24.

[108] Tr. 22:20-21.

[109] JX G.

[110] Tr. 24:14-21.

[111] Tr. 25:3-14.

[112] Tr. 25:15-18.

At the Respondent's request I am also taking judicial notice of the Register of Wills docket.[113] The Petitioners, through counsel, filed the Will with the Register of Wills on September 29, 2021, noting they were "uncertain if probate will be necessary."[114] Later on October 28, 2021, the Petitioners filed a petition to serve as administrators of the Estate.[115] The Respondent objected and counter-petitioned on November 5, 2021.[116] That afternoon, the Chief Deputy for the Sussex County Register of Wills issued a letter exercising her discretion to appoint a neutral third party to serve the Estate until this dispute is resolved.[117] Leslie DiPietro, Esquire was ultimately appointed.[118] The claims period expired on May 6, 2022, and the Register of Wills docket reflects two claims: one filed by Mr. Roll's estate and one filed by Ms. Lombard.[119] The inventory was filed on May 13, 2022 reflecting probate assets of $253,196.96.[120]

---

[113] Tr. 291:13-17. *See Arot v. Lardani*, 2018 WL 5430297, at *1 n.6 (Del. Ch. Oct. 29, 2018) (citing 12 *Del. C.* § 2501; D.R.E. 202(d)(1)(C)) ("Because the Register of Wills is a Clerk of the Court of Chancery, filings with the Register of Wills are subject to judicial notice.").

[114] *See In re Rende*, 24315 ("ROW"), D.I. 2-3.

[115] *See* ROW, D.I. 4.

[116] ROW, D.I. 5.

[117] ROW, D.I. 6.

[118] ROW, D.I. 8.

[119] ROW, D.I. 9, 11, 14.

[120] ROW, D.I. 16.

### D. Procedural History

On August 25, 2021, the Petitioners filed a petition seeking to remove the Respondent as co-trustee and co-agent alleging that the Respondent breached his fiduciary duty.[121] Unfortunately, the Decedent passed away shortly thereafter, and the Petitioners filed an amended petition on October 9, 2021 to remove the mooted count seeking removal of the Respondent as co-agent.[122] The amended petition also added several counts: (1) seeking the removal of the Respondent as co-personal representative of the Estate, (2) claiming unjust enrichment, (3) seeking an accounting, and (4) seeking the imposition of a constructive trust.[123] On November 2, 2021, the Respondent filed an answer asserting multiple affirmative defenses and three counterclaims for (1) breach of fiduciary duty by the Respondents, (2) an accounting, and (3) specific performance on transfers of real and personal property.[124] The Respondents filed an answer to the counterclaims, closing the pleadings, on November 30, 2021.[125]

---

[121] D.I. 1.

[122] D.I. 5.

[123] *Id.*

[124] D.I. 6.

[125] D.I. 10.

On January 14, 2022, I granted the proposed case scheduling order, teeing this action up for trial on May 3, 2022.[126] But the discovery process proved difficult. On January 24, 2022, the Petitioners filed a motion to compel discovery from the Respondent.[127] The Respondent responded with a countermotion on January 27, 2022.[128] Soon after, on February 4, 2022, the Petitioners filed a motion to strike the Respondent's response to the Petitioners' request for admissions.[129] The Petitioners also filed motions to quash two subpoenas *duces tecum*: one directed to Thomas E. Gay, Esq. and one directed to Mr. Gordon.[130] And the Respondent filed a motion seeking an interlocutory order requiring the Petitioners to provide an accounting for the Trust's funds.[131]

These motions were all resolved before trial. On March 8, 2022, I denied the motion to strike and the motion for an interlocutory order.[132] The next day, during a telephonic hearing, I denied the motions to quash both subpoenas.[133] I also

---

[126] D.I. 18.

[127] D.I. 24.

[128] D.I. 29. The Respondent also filed a motion for court-ordered mediation and continuance of trial. D.I. 30. The motion was denied in part, with regards to the court-ordered mediation, and the issue of the continuance was withdrawn during the hearing on March 9, 2022. D.I. 54, 58.

[129] D.I. 36.

[130] D.I. 40, 41.

[131] D.I. 49.

[132] D.I. 55, 56.

[133] D.I. 58.

instructed the Parties to meet and confer on the remaining disputes.[134]  This meet and confer was successful and all disputes were resolved by March 25, 2022.[135]

A one-day trial was held on May 3, 2022.[136]  After trial, the Petitioners and the Respondent submitted motions for interim relief.[137]  I ruled on the motions together, denying them in an order dated June 27, 2022.[138]  After post-trial briefing, I issued my draft report on October 5, 2022.[139]  Respondent filed exceptions and renewed his motion for interim relief.[140]  Exceptions were fully briefed on December 12, 2022 and the renewed motion for interim relief is ripe for consideration.[141]

## II. ANALYSIS

The Parties' various disputes consist of (1) claims for breach of fiduciary duty, (2) contests over property rights, and (3) various loose ends.  Regarding the first, the Parties each bring claims for breach, seeking accountings, removal, or damages.  For the second, the Parties dispute claims to (1) the Shore Drive Property (or, alternatively, the Fidelity IRAs), (2) the Vehicle, and (3) personal property retained

---

[134] *Id.*

[135] D.I. 69.

[136] D.I. 88.

[137] D.I. 83, 84.

[138] D.I. 95.

[139] D.I. 91, 92, 96.

[140] D.I. 97-98.

[141] *See* D.I. 102-103, 106.

by Ms. Lombard. As to the loose ends, I address the outstanding balance in the Fidelity Account, the complications regarding the Milton Property, the loans to the Respondent, and how the Trust and the Estate should move forward after the remedies awarded herein. I address these disputes in turn.

### A. The Parties each owed fiduciary duties as co-trustees and some were breached.

The Petitioners argue the Respondent breached his duties as co-trustee; the Respondent argues the reverse.[142] "A claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the [fiduciary] breached that duty."[143]

> A party bringing a claim for fiduciary breach generally ha[s] the burden of proving each element, including damages, of each of [his] causes of action . . . by a preponderance of the evidence. [P]roof by a preponderance of the evidence means that something is more likely than not. By implication, the preponderance of the evidence standard also means that if the evidence is in equipoise, the Plaintiff[ ] lose[s].[144]

Thus, the Petitioners bore the burden of proving the Respondent breached his duties, and vice versa.

---

[142] Although the Petitioners originally brought claims under the POA, those were removed after the Decedent's death. D.I. 5. *See also Rambo*, 2022 WL 4180890 (discussing the limitations on challenges for breaches of fiduciary duties under a power of attorney following the principal's death).

[143] *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010).

[144] *In re Happy Child World, Inc.*, 2020 WL 5793156, at *10 (Del. Ch. Sept. 29, 2020) (citations and quotation marks omitted) (alterations in original).

"Under default principles of Delaware law, a trustee owes fiduciary duties to a beneficiary."[145]  "At common law, the duties of a trustee to trust beneficiaries include loyalty, good faith, and due care."[146]  Trustees also owe "a duty to furnish information to a beneficiary upon reasonable request."[147]  But, with some limitations, "the terms of a governing instrument may expand, restrict, eliminate, or otherwise vary . . . [a] fiduciary's powers, duties, standard of care, rights of indemnification and liability to persons whose interests arise from that instrument."[148]  Trustees must also act within the scope of authority granted by the governing trust documents.[149]

Here, the Parties serve as co-trustees of the Trust and have owed the common law duties of loyalty, good faith, and due care from the date of their appointment: October 1, 2019.  They are also required to adhere to the terms of the Trust.  The Trust provided, in pertinent part, that the Parties, as co-trustees act "together and not

---

[145] *Tigani v. Tigani*, 2021 WL 1197576, at *13 (Del. Ch. Mar. 30, 2021).

[146] *In re Nat'l Collegiate Student Loan Trs. Litig.*, 251 A.3d 116, 185 (Del. Ch. 2020) (citations and quotations omitted).

[147] *Tigani*, 2021 WL 1197576, at *15 (citations and quotation marks omitted).

[148] 12 *Del. C.* § 3303.

[149] *Ross v. Freeman*, 180 A. 527, 532 (Del. Ch. 1935).

30

separately."[150] The Trust required that "any action to be taken by the Trustee . . . be with the unanimous consent of [the Parties.]"[151]

With these duties and limitations established, I turn to the alleged breaches.

**1.     The Respondent exceeded his authority and breached his duty of loyalty; as such, he should be removed as co-trustee.**

I find the Respondent exceeded the scope of his authority under the Trust and breached his duty of loyalty. Starting with the former, the Respondent admitted that he acted unilaterally to implement his investment plan by margining the IBKR Account. He was not authorized to act individually and, as such, exceeded his authority, in breach of the Trust. The Respondent also acted outside the scope of his authority by setting up the IBKR Account in the name of the Decedent, rather than the Trust. Those securities were assets of the Trust, and the Trust did not grant the Respondent any authority to convert those assets; neither did the Decedent retain such authority. The Respondent admitted that he set up the IBKR Account; thus, he should be held responsible for the improper titling.[152]

The Respondent also breached his common law duty of loyalty and engaged in self-dealing. "As a part of the duty of loyalty, a trustee must exclude all selfish

---

[150] JX T, p.16.

[151] *Id.* at p.16-17.

[152] *See* Tr. 268:23-269:6, 43:15-18.

31

interest and all consideration of the interests of third persons."[153] "[S]elf-dealing occurs when the fiduciary has a personal interest in the subject transaction of such a substantial nature that it *might* have affected his judgment in material connection."[154] Trustees owe a duty to "administer trust property solely in the interests of the beneficiary."[155] If the Petitioners prove self-dealing, "then the burden shifts to the fiduciaries ([here, the Respondent]) to demonstrate that the dealings were entirely fair."[156]

The Respondent admitted that he traded in the IBKR Account for his own personal benefit. And he claimed entitlement to the gain on the Trust's assets through the handwritten agreement and the Superior Court Action. Each was an independent breach of his duty of loyalty.[157] He continued his self-interested conduct in this action and failed to demonstrate that his dealings were entirely fair;

---

[153] *Paradee v. Paradee*, 2010 WL 3959604, at *10 (Del. Ch. Oct. 5, 2010) (citations and quotation marks omitted).

[154] *Stegemeier v. Magness*, 728 A.2d 557, 564 (Del. 1999) (emphasis in original, internal quotation marks omitted).

[155] *Walls v. Peck*, 1979 WL 26236, at *4 (Del. Ch. Oct. 24, 1979).

[156] *In re Happy Child World, Inc.*, 2020 WL 5793156, at *10.

[157] I would be remiss if I did not mention that the Respondent's continued claims under the alleged agreement are also barred by *res judicata* because of the Superior Court judgment. *See, e.g.*, *Cassidy v. Cassidy*, 689 A.2d 1182 (Del. 1997) (discussing *res judicata*, the procedural bar to relitigating claims that have already been decided). *See Rende v. Rende*, S20C-12-013 MHC, D.I. 29.

32

as Judge Conner from the Superior Court recognized, the alleged margin agreement lacked consideration and was entirely one-sided.

But the Respondent's improper claims did not stop at the IBKR Account. The Respondent also tries to assert ownership of the Shore Drive Property, which is an asset of the Trust. Although the Parties should have more clearly delineated the Respondent's interest in, and responsibilities for, the Shore Drive Property, the Respondent's claim that he owns, bought, or is otherwise entitled to claim title to the Shore Drive Property is frivolous and a breach of his duties to hold and retain assets of the Trust for the Trust's beneficiaries.[158]

The Petitioners also argue that the Respondent breached his duty of due care by engaging in margin trading. Specifically, they argue his conduct fell below the standard for a prudent investor. "[T]rustees are held to a prudent investor standard in the management and investment of a trust's assets or property. In managing trust property, trustees must act with skill, care, diligence and prudence in light of the

---

[158] *See also* JX T, p.12-13 ("no individual Trustee of any trust created hereunder shall have the power to participate in any decision concerning the distribution, use or application of income or principle for his or her own benefit unless the power is limited by an ascertainable standard described in Section 2401 of the Code;") "Code" is defined as "the Internal Revenue Code of 1986, as amended." *Id.* at p.15.

The Vehicle transaction is also concerning. As addressed below, I find the transaction is unenforceable and question the propriety of the Respondent's actions. But I struggle to find his conduct amounts to a breach of his duties as trustee, because, as far as I can tell, the Vehicle was outside the Trust. The Respondent as co-trustee had duties to the beneficiary vis-a-vis the Trust. This was a separate, albeit concerning, transaction.

circumstances."[159]  "In addition to correctly administering the trust, a trustee also must ensure the integrity of the corpus."[160]  But, a trustee "is not liable to a beneficiary for following a specific investment strategy to the extent that the trustee acted in reasonable reliance on the terms of the trust. And in reviewing the administration of a trust, [I] must consider the trustor's intent when the trust was created."[161]

Looking to the Decedent's intent as trustor of the Trust, I find the Respondent should not be held liable because his investment strategy is, arguably, permitted by the terms of the Trust.  In pertinent part, the Trust gives the Parties the power to:

> purchase or otherwise acquire, and to retain, whether originally a part of the trust estate or subsequently acquired, any and all stocks, bonds, notes, or other securities, or any variety of real or personal property, including stocks or interest in investment trusts, regulated investment companies and common trust funds, as it may deem advisable, whether or not such investments be of the character permissible by law for investments by fiduciaries. Investments need not be diversified and may be made or retained with a view to a possible increase in value[;][162]

> [t]o sell, convey, lease, pledge, transfer, exchange, convert or otherwise dispose of, or grant options with respect to, any and all property, real or personal, at any time forming a part of the trust estate, publicly or privately, without an order of court, in such manner, at such time or

---

[159] *Law v. Law*, 753 A.2d 443, 447 (Del. 2000) (citation omitted).

[160] *Id.* at 447-8 (citation omitted).

[161] *Id.* at 448 (citations omitted).

[162] JX T, p.9.

times, for such purposes, for such prices and upon such terms, credits and conditions as it may deem advisable[;][163]

and

[t]o borrow money for any purpose connected with the protection, preservation or improvement of the trust estate whenever in its judgment advisable, and as security to pledge any real or personal property forming a part of the trust estate upon such terms and conditions as it may deem advisable.[164]

Of course, this authority is limited by the requirement that the Parties take all actions and make all decisions jointly, not individually; the Respondent breached that limitation and exceeded his authority by acting alone. But assuming the Parties acted jointly to implement the Respondent's investment plan, the Petitioners have not demonstrated that margin trading was impermissible under the Trust or, more likely than not, against the Decedent's intent reflected therein. Finding the evidence in equipoise, I find the Petitioners failed to prove the Respondent breached his duty of care.

Having found the Respondent exceeded the scope of his authority and breached his duty of loyalty, I turn to the appropriate remedy. The Petitioners argue

---

[163] *Id.*

[164] JX T, p.10.

that the Respondent should be removed as co-trustee and assessed judgment in the amount of $1,332,822.30.[165]

I turn first to removal and find the Respondent should be removed as co-trustee. Removal is not warranted by "some mere negligent breach of duty, arising largely from an honest mistake."[166] "But a court will usually remove a trustee if his duties, as such, are in conflict with his individual or other interests."[167] Such is the case here. The Respondent admitted to using assets of the Trust for his own benefit and has shown that he is unable to put his personal interests aside for the benefit of the Trust and its beneficiaries. I find he should, thus, be removed as co-trustee.[168]

But the Petitioners have failed to prove that judgment should be entered against the Respondent. "It is, of course, fundamental that a fiduciary who breaches his duty is liable for any loss suffered by the beneficiary of his trust. Moreover, given the nature of the right, it is also well established that any profit made through the

---

[165] The Petitioner contends this amount consists of $234,125.00 in 2019 federal tax liability, $52,183.00 in 2019 Delaware state tax liability, $159,700.00 for the December 18, 2019 margin call, $824,744.82 for transactions in 2020 related to margin calls, $1,264.09 for November 2019 margin interest, $5,597.01 for December 2019 margin interest, $39,929.97 for January through December 2020 margin interest, $7,609.43 for November 2019 margin commissions, $7,498.81 for December 2019 margin interest, and $170.46 for 2020 margin interest. D.I. 92.

[166] *In re Catell's Est.*, 38 A.2d 466, 469–70 (Del. Ch. 1944) (citations omitted).

[167] *Id.*

[168] Under the Trust, if any of the co-trustees is removed, "the remaining of them shall serve as Trustee." JX T, p.17.

breach of trust may be disgorged through the device of constructive trust."[169]  But

the Petitioners, as the moving parties, needed to present a non-speculative basis on

which to quantify damages.  They failed to do so.

I find *Stone v. Stant*, 2010 WL 2734144, at *16 (Del. Ch. July 2, 2010) most

helpful.  There, Vice Chancellor Noble found that a fiduciary breached the prudent

investor standard but held any award of damages would be arbitrary.  Although the

moving parties demonstrated that the fiduciary engaged in risky day trading, which

resulted in a loss, the moving parties did not offer evidence "that would inform the

Court of what the prudent investment of funds during the time in question would

have generated."[170]  Thus there was no measuring stick to ensure an award of

damages for losses would be anything but arbitrary.[171]

The same is true here. The Petitioners seek to hold the Respondent liable for

taxes, interest, and commissions related to the Respondent's margin trading.  But

they admit that, while the Respondent had control of the IBKR Account, it increased

in value and there was, ultimately, a net benefit.[172]  The Petitioners have failed to

present any evidence that the securities would have yielded a better return had the

---

[169] *Thorpe v. CERBCO, Inc.*, 1993 WL 443406, at *12 (Del. Ch. Oct. 29, 1993) (citations omitted).

[170] *Stone v. Stant*, 2010 WL 2734144, at *16.

[171] *Id.*

[172] *See* Tr. 107:13-22.

37

Respondent not acted as he did, and by how much.[173]  Thus, I find the only available remedy for the Respondent's breach of his duties is his removal as co-trustee.

> **2.  The Respondent failed to prove that either of the Petitioners breached their duties as co-trustees, but accountings should, nonetheless, be produced.**

Generally, the Respondent argues that the Petitioners breached their duty of disclosure by refusing to provide information to the Respondent as co-trustee and engaged in self-dealing regarding the Fidelity IRAs.  The Respondent alleges six separate breaches of duty arising from (1) Ms. Lombard's actions from March 2019 until the Final Plan, (2) Ms. Lombard's failure to return property per the Family Court settlement agreement, (3) the Petitioners "abruptly" taking control of the IBKR Account, leading to a loss, (4) the Petitioners refusing to provide the Respondent with information about the Trust and the Estate, (5) the Petitioners refusing to provide information in this action, and (6) Ms. Lombard changing the beneficiaries of the Fidelity IRAs.  I find the Respondent failed to prove the Petitioners breached their fiduciary duties.[174]

---

[173] Further, I struggle to appreciate why the Respondent should be held liable for the losses related to the margin calls, which occurred after the Parties agreed the Respondent should not be margining the IBKR Account. At that time, the Petitioners took over management of the IBKR Account and they have failed to prove by a preponderance of the evidence that the losses after December 2019 were caused by or directly attributable to the Respondent.

[174] The Respondent challenges this finding in his exceptions, arguing that "[a]fter the Decedent's death . . . the Petitioners raided the Investment Accounting and withdrew their share of the Investment Account while asking Fidelity to freeze Respondent's share.  None

Initially, the Respondent's arguments regarding Ms. Lombard's conduct before the Final Plan, when she served as power of attorney, are no longer viable because the Decedent has passed; that resolves items (1) and (6).[175] Second, I find

---

of this was disclosed to Respondent but clearly implicates not only the duty of disclosure but also the duty of loyalty through self-dealing." D.I. 101. Upon review and further consideration, I continue to find the Respondent failed to prove the Petitioners breached their fiduciary duties by a preponderance of the evidence.

[175] *See Rambo*, 2022 WL 4180890, at *6. The Respondent challenges this holding on exceptions, arguing that the Respondent has standing to challenge the pre-death transactions under *Hill v. Myers*, 2020 WL 3171372 (Del. Ch. June 15, 2020), *Schock v. Nash*, 732 A.2d 217 (Del. 1999), and *Stegemeier v. Magness*, 728 A.2d 557 (Del. 1999).

*Hill* is a final report I issued on a motion to dismiss, wherein I found that certain intestate heirs plead a reasonably conceivable claim that an attorney-in-fact breached her fiduciary duties to the decedent by selling real property prior to the decedent's death. The real property was bequeathed to the moving heirs and the operative pleading alleged the property was sold at a loss and to frustrate the heirs' inheritance.

In *Schock*, the Delaware Supreme Court addressed a challenge by an estate trustee and beneficiary to transfers made by an attorney-in-fact prior to the decedent's death. The court identified "current Delaware law," as rendering attorney-in-fact transactions which violate the fiduciary duty of loyalty "voidable at the behest of the beneficiary." *Schock v. Nash*, 732 A.2d at 225–26. The Respondent attempts to read this language broadly to support that all beneficiaries of a deceased principal's estate may challenge pre-death actions by an attorney-in-fact. But context dispels any such notion. In *Schock*, the court explained "[t]he common law fiduciary relationship created by a durable power of attorney is like the relationship created by a trust. The fiduciary duty principles of trust law must, therefore, be applied to the relationship between a principal and her attorney-in-fact." *Id.* Thus, in the power-of-attorney context, the "beneficiary" of the fiduciary relationship is the principal of the power, not the ultimate beneficiaries of the principal's estate. The *Schock* court expressly recognized as such, explaining in the matter before it, "the settlor and beneficiary are the same." *Id.* at 229. Because the challenge before *Schock* was brought by the principal's estate, standing was not an issue.

Finally, the Respondent points to *Stegemeier*. But *Stegemeier* was a trust case, where beneficiaries of the trust challenged actions taken by the trustee; here I am addressing post-death challenges by estate beneficiaries to actions taken by an agent, or attorney-in-fact, to the deceased principal.

this Court should not convert alleged noncompliance with the Family Court settlement agreement into a breach of fiduciary duty. If anything, the Respondent may have claims within the Family Court's jurisdiction or for breach of contract; none of which are ripe for my consideration. Third, the evidence does not support that the Petitioners "abruptly" took control of the IBKR Account; rather, the Parties testified consistently that there was an agreement regarding how the IBKR Account would be held and managed after December 18, 2019.[176]

The Respondent's strongest argument relates to the duty of disclosure (items (4) – (5)). Again, trustees owe "a duty to furnish information to a beneficiary upon reasonable request."[177]

---

I find the pleading stage ruling in *Hill* unpersuasive. Rather, I follow the logic of *Schock*, coupled with 12 *Del. C.* § 49A-116, as interpreted in *Rambo*, 2022 WL 4180890, at \*6 and bolstered by 10 *Del. C.* § 3701. In the power-of-attorney context, the principal is the only "beneficiary" of the fiduciary relationship created thereby. Claims the principal may have for breach of fiduciary duty survive to the fiduciary of the principal's estate, not the beneficiaries of the principal's estate. Because I have not changed this finding on exceptions, the Respondent's additional exceptions in Section I(A)-(C) of the opening brief on exceptions are not addressed as moot. D.I. 101.

Because I find these claims are not viable neither are the requests for relief in the form of accountings of the WSFS Account and the mortgage payments received by Ms. Lombard. Those were not assets of the Trust; the former was purportedly management by Ms. Lombard as attorney-in-fact and the latter are assets of the Estate.

The Respondent also appears to request an accounting regarding Ms. Lombard's management of the Ameritrade Account. But she managed such in her capacity as attorney-in-fact and, for the foregoing reasons, the Respondent does not have a viable claim for an accounting thereof.

[176] Tr. 199:16-200:8.

[177] *Tigani*, 2021 WL 1197576, at \*15 (citations and quotation marks omitted).

> Beneficiaries are entitled to information including the existence of the trust, their status as beneficiaries . . . any significant change in their beneficiary status; and . . . material information needed to protect their interests. The scope of a beneficiary's rights under a trust dictates what constitutes information needed to protect their interests, such that [t]he terms of a trust may alter the amount of information a trustee must give . . . and persons to whom[ ] it must be given.[178]

The Respondent argues that the Petitioners breached this duty by refusing to provide the Respondent with information both before and after the Decedent's death.

Before the Decedent's death, the Respondent's concerns appear to be limited to the IBKR Account after December 18, 2019, because he "had zero access. [He] knew nothing about what was going on. [He] asked 50 times what's happening. [He] was given the cold shoulder saying 'Tough we don't have to tell you.'"[179] But the Respondent has failed to introduce documentary evidence showing he requested such access, and his request was denied.[180] Without such support, I find the Respondent's testimony lacks credibility and is insufficient to meet his burden of demonstrating, by a preponderance of the evidence, that the Petitioners breached their duty of disclosure before the Decedent's death.

---

[178] *Id.* (alterations in original, citations and quotation marks omitted).

[179] Tr. 199:3-8.

[180] *Cf.* JX S, FF-LL, PP-QQ, VV. The closest the Respondent comes to asking for information is an email from September 7, 2020, where he writes: "I hated to blow this whole thing up, however, ive [*sic*] asked to see whats [*sic*] going on with [the Decedent's] affairs bank accounts etc. [the Petitioners] refuse." JX LL, p.2.

After the Decedent's death, the Respondent argues that he made requests for information in this litigation. Specifically, the Respondent points to the Petitioners' response to his counter-motion to compel where the Petitioners admit that they "withheld their document production."[181] They did so because they "were concerned that [the] Respondent may utilize the documents to access accounts to which he was not authorized to access and, for that reason, sought a Confidentiality Order from this Court."[182] Although this dispute was resolved, the Respondent argues the Petitioners continued to withhold information about the IBKR Account.[183] But the Respondent had the ability to independently access, request, or collect this information as co-trustee. The Respondent does not appear to have made any attempts to do so, and I find his lack of effort undermines his claim for breach of duty, which is otherwise unavailing.

But, even absent a breach, the Petitioners "have a duty to account to beneficiaries for their disposition of trust assets and bear the burden of proving that a disposition was proper."[184] Under this general principle, the Petitioners should be

---

[181] D.I. 35, ¶8.

[182] *Id.*

[183] Specifically, the Respondent points to JX HHH, which is a December 2019 statement from the IBKR Account, which reflects it was generated on December 27, 2020, but was not identified as an exhibit until the day before trial. D.I. 91, p.13.

[184] *Hardy v. Hardy*, 2014 WL 3736331, at *12 (Del. Ch. July 29, 2014) (internal quotations and alterations omitted).

required to account for the IBKR Account for the period of December 18, 2019 through the date it was closed. The Petitioners should also be required to account for the Fidelity Account from the date it was funded from the IBKR Account to the date of the Decedent's death.

**B.    The Respondent's property claims should fail.**

The Respondent argues that he is entitled to certain assets currently reflected as assets of the Estate or non-probate assets, which passed to the Petitioners. He also argues that Ms. Lombard retained certain assets that should be transferred to the Estate. I address these in turn.

The Respondent claims ownership of the Shore Drive Property (or a corresponding interest in the Fidelity IRAs) and the Vehicle. Both items of property, he contends, were gifted or promised to him by the Decedent, and he seeks specific performance of those gifts or promises. To the extent the Shore Drive Property is not transferred to him, the Respondent claims an interest in the Fidelity IRAs, arguing that he was only removed as beneficiary because he was given the Shore Drive Property. The Respondent's ultimate claim is one for specific performance of the alleged agreements or promises. "To grant specific performance,

there must be proof of a valid contract . . . and proof that plaintiff was ready, willing and able to perform his contractual obligations."[185]

The Respondent has produced no documentation supporting his claim that the Shore Drive Property was sold to or otherwise gifted to him during the Decedent's life.[186] The Shore Drive Property was purchased with assets of the Trust and titled in the name of the Trust. I find by a preponderance of the evidence that the Shore Drive Property was always intended to be an asset of the Trust.[187]

---

[185] *Morabito v. Harris*, 2002 WL 550117, at *2 (Del. Ch. Mar. 26, 2002).

[186] *Cf. Frye v. Raphaelson*, 2021 WL 4073425, at *2 (Del. Ch. May 3, 2021), *adopted*, (Del. Ch. 2021) ("in the real property context, plaintiffs must set forth a reasonably conceivable claim that the agreement was in writing or that an exception to the statute of frauds applies"). The Respondent challenges this finding on exceptions, arguing that the parties reached an agreement through email on April 29, 2020 that the Shore Drive Property would be purchased for the Respondent, satisfying the statute of frauds. D.I. 101 (citing JX KK). "A contract must contain all material terms in order to be enforceable, and specific performance will only be granted when an agreement is clear and definite and a court does not need to supply essential contract terms." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (alterations and internal quotation marks removed) (quoting *Ramone v. Lang*, 2006 WL 905347, at *10 (Del. Ch. Apr. 3, 2006)). The email chain in JX KK fails this test.

[187] Not only was this the most persuasive story from the conflicting testimony at trial but, had the Parties acted to convert assets of the Trust for the Respondent's sole benefit, such would likely be a breach of their fiduciary duties. *See Merrill Lynch Tr. Co., FSB v. Campbell*, 2009 WL 2913893, at *7-8 (Del. Ch. Sept. 2, 2009) (discussing a trustee's duty of impartiality to multiple beneficiaries). At best, it appears the Parties intended to provide the Respondent with a life estate or other limited interest in the Shore Drive Property. But the Respondent took an all-or-nothing approach and, despite the opportunity to do so, did not advocate in post-trial briefing for any interest short of full ownership. In my draft report, I declined to act *sua sponte*.

Through his exceptions, the Respondent takes issue with this holding and the version of this footnote in my draft report. Specifically, the Respondent argues that my refusal to act *sua sponte* to address a property interest short of full ownership leaves an

I further find that the Respondent has failed to establish an interest in the Fidelity IRAs. The Fidelity IRAs passed outside the estate to the named beneficiaries. The Respondent was removed as a beneficiary by Ms. Lombard; she contends it was done at the Decedent's request and the Respondent contends it was, instead, a self-dealing transfer.

The Respondent cites *Coleman v. Newborn*, 948 A.2d 422, 429 (Del. Ch. 2007), which quotes from *Faraone v. Kenyon*, 2004 WL 550745, at *11 (Del. Ch. Mar. 15, 2004): "A self-dealing transfer of the principal's property to the attorney-in-fact is voidable in equity unless the attorney-in-fact can show that the principal

issue undecided and destined for future conflicts. Although I agree future disputes appear likely, the Respondent's attempt to shift the blame is not well taken. In post-trial briefing, the Respondent requested "[a]n Order from the Court granting full and complete title of" the Shore Drive Property to the Respondent. D.I. 91. The Respondent made no argument regarding a life estate or other interest short of full ownership. Rather, the argument appears for the first time in the exceptions, which is impermissible. *Thor Merritt Square, LLC v. Bayview Malls LLC*, 2010 WL 972776, at *5 (Del. Ch. Mar. 5, 2010) ("The failure to raise a legal issue in an opening brief generally constitutes a waiver of the ability to raise that issue in connection with a matter under submission to the court."); s*ee also Walsh v. William T. Spooner Post 17, Inc.*, 2013 WL 5569192, at *1 (Del. Ch. Oct. 9, 2013) (finding an argument waived when reserved for exceptions). The Respondent likewise argues for the first time on exceptions that, if specific performance is denied, the Court should order alternative relief to balance the equities; any such argument and request for relief should have been made in post-trial briefing and has been waived. *Id.*

I also find I cannot address the Petitioners' request for judgment against the Respondent for fees and expenses related to the Shore Drive Property; despite the opportunity to do so, the Petitioners did not present sufficient evidence at trial to support such an award. *See* D.I. 91, p.29. The only evidence adduced at trial was the testimony of Ms. Lombard that the Respondent failed to pay certain expenses. Tr. 67:19-68:5. Nothing has been presented to show what was or was not paid, when. Thus, any award of damages would be speculative.

voluntarily consented to the interested transaction after full disclosure." In *Coleman*, Vice Chancellor Lamb relied on that quote in granting a principal's request to set aside a property transfer to her former agent.[188] In *Faraone*, Justice Jacobs, sitting by designation, addressed a challenge brought by the deceased principal's executor against her former agent.[189]

But the Respondent does not stand in the same position as the moving parties in *Coleman* and *Faraone*; he is not the principal nor is he serving as executor of the Estate. Nor can he invoke standing under the Trust, as co-trustee, because the Fidelity IRAs are not assets of the Trust. Rather, I find the Respondent only had standing to challenge Ms. Lombard's conduct regarding the Fidelity IRAs during the Decedent's lifetime.[190] Thus, his claim should fail. I find the Respondent is not entitled to any portion of the Fidelity IRAs to which he was not designated as a beneficiary on the date of the Decedent's death.[191]

---

[188] *Coleman v. Newborn*, 948 A.2d 422, 429-30 (Del. Ch. 2007).

[189] *See generally Faraone v. Kenyon*, 2004 WL 550745, at *11 (Del. Ch. Mar. 15, 2004).

[190] *In re Burke Est.*, 2016 WL 4217752, at *5 (Del. Ch. Aug. 10, 2016) ("With one exception, the above statute contemplates petitions for judicial relief from interested persons while the principal is alive. The exception is for cases where the personal representative, trustee or beneficiary of the principal's estate might seek appropriate relief, i.e., an accounting, under Section 49A-114(g).").

[191] I further find the Respondent's argument should fail on its merits. The Respondent contends the Decedent wanted her entire estate, probate or non-probate, to pass equally to her three children. Per the Respondent, the beneficiary designations for the Fidelity IRAs violated that general principle. But the Respondent does not appear to dispute the IRA conversion account with TD Ameritrade, which named the Respondent and Ms. Rende as 50/50 beneficiaries. D.I. 78, p.13. Further I find the Respondent's testimony that the

46

I further find the Vehicle is an asset of the Estate. The Respondent produced a handwritten receipt for the purchase of the Vehicle, but title to the Vehicle was never transferred and the Vehicle has been outside the Respondent's custody or control since March 30, 2020, when it was collected by the police. Further, the circumstances surrounding the handwritten receipt are concerning and reflect poorly on the Respondent.[192] As such, he has failed to meet his burden to prove ownership of the Vehicle. The Vehicle should be provided to the Estate by whomever has current possession and control.

Finally, the Respondent argues that Ms. Lombard should be required to return certain real property to the Estate, including jewelry and a tea set. But this dispute was already litigated before the Family Court and the parties settled their dispute. To the extent the Respondent seeks to relitigate this issue, he is barred by *res judicata*.[193] To the extent he contends the settlement agreement was breached, the

---

Decedent approved of the Superior Court Action was not credible; I find it much more likely that she was displeased and acted in response to remove the Respondent as a beneficiary of the Fidelity IRAs. On the record before me, I find by a preponderance of the evidence that the Decedent directed Ms. Lombard to change the beneficiary designations for the Fidelity IRAs as a response to the Superior Court Action.

[192] By the Respondent's own admission, the Decedent may have lacked capacity to so contract (or otherwise been of weakened intellect) and the Vehicle was worth substantially more than $1.00. Tr. 253:6-24. *See* JX PP, p.2; JX X, p.1.

[193] *See Dover Hist. Soc'y, Inc. v. City of Dover Plan. Comm'n*, 902 A.2d 1084, 1092 (Del. 2006) ("*Res judicata* operates to bar a claim where the following five-part test is satisfied: (1) the original court had jurisdiction over the subject matter and the parties; (2) the parties to the original action were the same as those parties, or in privity, in the case at bar; (3) the original cause of action or the issues decided was the same as the case at bar; (4) the issues

Respondent has failed to plead and prosecute a breach-of-contract claim. Thus, his request for relief relating to this personal property should be denied.

## C. The loose ends should be wrapped up.

The remaining loose ends relate to (1) the funds locked or frozen in the Fidelity Account, which have not been released to the Respondent, (2) loans the Decedent made to the Respondent, (3) the Milton Property, and (4) the Estate's administration.[194] I find (1) the Fidelity Account should be disbursed to the Respondent, in part, with (2) $14,729.00 directed instead to the Decedent's estate for repayment of the loans, (3) that the Petitioners, as the remaining co-trustees, should exercise the Decedent's option regarding the Milton Property, and (4) that the Estate should be administered by the current neutral fiduciary.

The Petitioners have failed to prove non-speculative damages arising from the Respondent's breach of his fiduciary duties. I see no reason to continue holding the Respondent's portion of the Fidelity Account, unless the banking institution has an independent basis to do so, which would be outside this Court's jurisdiction. But I find the loans the Decedent made to the Respondent, which have not been repaid,

in the prior action must have been decided adversely to the appellants in the case at bar; and (5) the decree in the prior action was a final decree.").

[194] Both sides also request that I shift fees and costs in their favor but neither has briefed the issue fully. I am inclined to defer any consideration of fee and cost shifting until the conclusion of this proceeding, which will not occur until after the accountings are submitted and any related disputes are resolved. I invite the Parties to discuss an appropriate schedule for these final stages.

should be deducted from the Respondent's recovery and directed, instead, to the Estate.

The Respondent does not dispute that the Decedent loaned him, and he failed to repay, $14,729.00.[195] But he argues that the loans were forgiven because the Decedent told him "not to bother" paying her back because the money would be his anyway.[196] Even if I accept this convenient testimony, I disagree that this was an enforceable forgiveness. At most it reflects (1) the Decedent deferring payment until after her death, because the loans could be repaid from the Respondent's share of the Estate or (2) the Decedent's mistaken belief that the Estate could not collect on debts owed to her. Neither supports a finding that the loans were forgiven before the Decedent's death and the loans did not extinguish or become unenforceable thereafter.[197] The loans should be paid directly to the Estate from the Respondent's share of the Fidelity Account.

---

[195] Tr. 271:9-20.

[196] Tr. 271:19-24.

[197] *See* 10 *Del. C.* § 3701 ("All causes of action, except actions for defamation, malicious prosecution, or upon penal statutes, shall survive to . . . the executors or administrators of the person to, or against whom, the cause of action accrued. Accordingly, all actions, so surviving, may be instituted or prosecuted by . . . the executors or administrators of the person to . . . whom the cause of action accrued"); 12 *Del. C.* § 1905 (providing in relevant part that an estate's inventory is to include, *inter alia*, "a list of all debts and credits due or belonging to the decedent or to the decedent's estate").

Once the Respondent is removed as co-trustee, the Petitioners, as the remaining co-trustees, should exercise the Decedent's option to purchase the Milton Property. The co-trustees should then act jointly to administer the Trust under its terms. The Respondent's request to terminate the Trust and issue an order for distribution thereof should be denied without prejudice to renew after the accountings contemplated herein are completed and to the extent the Parties dispute ultimate distribution.

Finally, I turn to the Estate. The Petitioners ask that they be appointed co-executrixes of the Estate.[198] But I am not inclined to remove the current disinterested representative in favor of any of the Parties. Initially, I would not do so without providing notice to such representative and the opportunity to be heard. But, moreover, I see great benefit to a neutral representative administering the Estate, considering the contentious relationship between the Parties. I appreciate, however, that the representative may have agreed to serve only for a limited time and may be unwilling to continue; if so, this recommendation is no bar to consideration of a petition from the representative seeking permission to resign.

---

[198] D.I. 92, p.31.

**D.    The renewed motion for interim relief should be denied.**

In Respondent's renewed motion he argues that he has prevailed on his claim to his share of the Fidelity Account, thus, the funds should be released without delay. The Respondent argues his "continued life as a pauper in a state of poverty creates irreparable harm."[199]  The Petitioners counter that the request is barred by the law of the case doctrine and the Respondent fails to demonstrate irreparable harm.  The Petitioners further argue that the relief sought by the Respondent cannot be granted because Fidelity is in indispensable party to any request for release of the funds and has not been joined.

In my draft report, I found the Fidelity Account should be disbursed to the Respondent, in part, with $14,729.00 directed instead to the Decedent's estate for repayment of the loans.  I explained then, as I do again here, "I see no reason to continue holding the Respondent's portion of the Fidelity Account, unless the banking institution has an independent basis to do so, which would be outside this Court's jurisdiction."[200]  Neither side took exceptions to that finding and, because it is unchanged in this final report, further exceptions are barred under Court of

---

[199] D.I. 98.

[200] The Respondent argues "Fidelity has no interest in the funds except to comply with whatever the Court determines." D.I. 100.  But the bank froze the remaining funds on its own initiative, albeit prompted by knowledge of this action. The Court is not privy to the bank's internal processes, nor has the bank had formal notice of the request for release and the opportunity to respond and state any objections in this action. On this record, I am hesitant to issue an order directing Fidelity, a third party, to act.

Chancery Rule 144. With an uncontestable ruling that the Fidelity Account should be disbursed, I expect this matter will resolve itself. But I find interim injunctive relief is unwarranted and the renewed motion should be denied.[201]

## III. CONCLUSION

For the foregoing reasons, I find the Respondent breached his fiduciary duties and should be removed as co-trustee; the Petitioners should continue as co-trustees in his absence. In that role, the Petitioners should exercise the option regarding the Milton Property and otherwise administer and distribute the Trust according to its terms. The Petitioners should, however, account for the IBKR Account and Fidelity Account from December 18, 2019 through the date of the Decedent's death. Any cloud on title to the Shore Drive Property and the Vehicle should be resolved in favor of the Trust and the Estate, respectively. The Respondent should be provided his share of the Fidelity Account, less the unpaid loans, which should be paid directly to the Estate, unless Fidelity has an independent reason to refuse distribution. And the Estate should be administered by the appointed neutral representative until further order of this Court.

---

[201] The "*sine qua non* of preliminary injunctive relief" is "the threat that irreparable harm will befall [the moving party] between" the time of the request and a final order "unless an injunction issues." *Kingsbridge Cap. Gp. v. Dunkin' Donuts Inc.*, 1989 WL 89449, at *4 (Del. Ch. Aug. 7, 1989). Through this final report, a final ruling is issued regarding the Fidelity Account, which negates any good faith basis the Petitioners may have had to request that the freeze continue and should be sufficient to compel the institution to release such funds in the manner prescribed herein.

This is my final report and exceptions may be filed under Court of Chancery Rule 144.